Good afternoon. Welcome all to our Richard H. Chambers courthouse here in Pasadena. This is the time set for the case of Kim Rode et al. versus Rob Bonta in his official capacity as Attorney General of the State of California. If counsel are ready to proceed, you may come forward. Good afternoon, your honors, and may it please the court. Helen Hong for the Attorney General. With the court's permission, I'd like to reserve five minutes for rebuttal. The Supreme Court has recognized that states may implement laws to ensure that those keeping and bearing arms in a jurisdiction are authorized to do so. The court has emphasized that shall issue licensing regimes, which often require applicants to undergo background checks, are constitutionally permissible under the Second Amendment. In 2016, California enacted such a regime designed to ensure only that those purchasing ammunition in the state are authorized to do so. The law channels ammunition transactions to licensed ammunition vendors and requires those vendors to conduct background checks and face-to-face transactions before transferring ammunition to a consumer. Those checks impose little delay for minor fees and authorize consumers to purchase an unlimited quantity of ammunition. The footnote says that you can't have such systems if they're abusive. What are the legal criteria we are to apply in determining whether a system is abusive? Your honor, footnote 9 itself provided some direction and guidance on that question and suggested that regimes that have unreasonable delays or exorbitant fees may be abusive. Justice Kavanaugh suggested that these are as applied challenges when the system is not working as intended. If a licensing regime is designed to ensure only that those purchasing or acquiring ammunition or arms are authorized to do so and the delays are attendant to that task, then I don't think that it would be abusive within the meaning of footnote 9, no matter how long the delay may be. In this case, because that delay is just mere minutes and the record reflects that vast majority, nearly 90 percent of ammunition transactions. For 11 percent, it's not minutes, correct? Yes, for 11 percent. You've denied the transaction without any affirmative proof that the person is ineligible to have ammunition or is legally disqualified under the second amendment. They're not denied from purchasing ammunition, your honor. Those individuals may try to figure out what the mismatch or the problem with the entry in the automated firearm system may be. It could be something like an individual has moved since that firearm was registered with the state. That would just require a self-service option to update the address in the automated firearm system. But individuals who would like to purchase ammunition and not go through the process of updating their records in the AFS system, of course, are also authorized to purchase after completing a background check under the basic check system, your honor. That basic check system is a comprehensive background check, so it operates like the background checks that are described in footnote 9 of Bruin. It's one where Department of Justice Bureau of Firearms personnel are going through four different... That costs how much? That one's $19. And how long does it take? On average, five to six days, your honor. How much does a box of ammunition cost? I think it depends, your honor. $13 to $20, something like that? Again, it depends. You know, I accompanied a friend to purchase ammunition this weekend. There were boxes of 9mm that were on sale for $12 a box. 22 CCIs were a little bit more. But I think... So if you avail yourself of... If the faster one for $5 doesn't work, you have to pay more for the background check than for the box of ammunition to get a box. I don't know if you... I'm sure you listened to the arguments yesterday, and you could talk... And it seemed like... A little unclear, but it seemed like the state's position there, which I understand is not California, it's Hawaii, was that abusive... Abusive turned on how a state was applying its rules, but that the rules themselves could never be so egregious so as to be abusive. What's California's position on... Can a system be abusive within the meaning of footnote nine if it's based on super high fees, or is it only if the state is somehow applying it in a way that makes it abusive? Yeah. So I don't want to speak for my colleagues from Hawaii. I think there are... Maybe if I put it this way, a licensing scheme that imposes high fees and include delays that are not tied to the intrinsic task of determining whether someone is authorized to purchase arms, that might not even fit the definition of a shall issue licensing scheme as contemplated in Bruin itself. So a state couldn't slap a label of licensing scheme and say, this is a shall issue licensing regime. It is per se constitutional or presumptively constitutional and only as applied abusive challenges may arise. But I think that in the if it wouldn't pass something like rational basis review, then it would be abusive. No, Your Honor. If the system itself is not designed to ensure only that those possessing or keeping arms in a jurisdiction are authorized to do so. So if a state were to come up with a regime and called it a licensing scheme, but imposed delays of, let's say, a year, and that delay was not at all tied to the state's task. Isn't there evidence that about 11% of people, 50,000 people didn't get ammunition? You said they weren't denied, I guess. So if they're not denied, they're just being delayed. So it might be accurate to call that being delayed. And I think there's something about a significant number, maybe a majority of those still had not gotten any ammunition within six months. So you said a year just now, six months count or has it got to be a year? Well, of course, I mean, it was 60% were able to actually acquire ammunition within six months after initial rejection from the standard check, but of course- 60, 60 or 16? 60, Your Honor. So a majority of individuals who were initially- Of the 11%? Correct. That leaves about 5%, if I'm doing my math right, that couldn't get it. And do you know what percentage of the 5% actually were prohibited for some objective reason? No, Your Honor, we don't have any- That's still like 20. If I'm doing my math right, that's over 20,000 people. Your Honor, millions have been able to successfully acquire ammunition in the state- That's a little bit like saying millions of people have been able to speak, we're only saying that these particular group of people can't speak. And certainly anyone who has denied the opportunity to acquire ammunition after trying the standard check, perhaps not going through the basic check in the five to six days that it takes for the state to run through the databases. If an individual is still unable to acquire ammunition and can demonstrate that they're not otherwise prohibited from doing so, then as applied challenges remain for those individuals to challenge the system. But the system itself is designed to ensure only that those purchasing ammunition in the state are authorized to do so. And the system is designed to use a database that is connected to what is protected act of acquiring ammunition or the portion of the act that is protected, which is acquiring ammunition to make their arms operable. In the state of California, the individuals that have arms are for the large part in the database that is the automated firearm system. Can you address the frequency and whether that's abusive? Because if you get one type of check, it's valid for 30 days, but only one purchase. So if you do two purchases within 30 days, that's out. And then if you did a purchase last week, you got to do it all over again. And if it was a basic check that took a week, you got to do it all over again every time. What is the justification for having this? Do people suddenly commit felonies? Like, do you worry that they actually like became a felon who's no longer eligible within a week? Sure. I mean, there are other reasons for ineligibility as well. So domestic violence restraining orders, red flag laws, mental health. Do you have any data that on how frequently people fall into those categories that you have to have this every snapshot multiple times, potentially a month or a year? I don't have that data, Your Honor. But I guess stepping back, the question about the frequency and whether it makes ammunition point of sale background checks meaningfully different than issue licensing regimes endorsed by the Supreme Court. It's both a record based one and then a legal one. So the record based one is the question that Your Honor asked is if the frequency is such that an individual is going in to buy ammunition every day, then what does the background check accomplish? But plaintiffs have not established anything in this record that establishes that sort of frequency. And in fact, in the New York State Firearms Association versus James case out of New York that addressed New York similar ammunition background regime, the plaintiff there entered in a declaration that suggested that the average gun owner in America purchases about 100 rounds a year. That would equate to 250 round boxes. If there are 20 round boxes, five of them. That frequency is not any meaningfully different or constitutionally different at least than the type of licensing regimes that the Supreme Court has endorsed. And is there any limit on the amount of ammunition you can buy at one time? No, Your Honor. And so an individual who would want to have 100, 1000, 2000 rounds of ammunition can purchase that in one transaction after one successful completion of the background check, whether it's a standard check, basic check or the other mechanisms that the state provides for getting authorization to purchase ammunition. You've gotten a number of questions now about how the scheme applies to different categories of purchasers. What is the significance of the fact that this is a facial challenge in your view? Your Honor, I think the significance of it is that the statistics that Judge Van Dyck had mentioned don't really bear on the facial challenge. The question is whether the scheme is designed is abusive, whether the scheme is designed in imposes unreasonable delays or exorbitant costs. And we don't think that figure demonstrates anything close to the scheme itself being abusive or the scheme itself meaningfully constraining rights protected under the Second Amendment. If I can go back to the frequency question, there was the factual record point about how I don't think that the frequency of purchasing ammunition as a factual matter distinguishes background checks from licensing regimes. But I also think just as a legal matter, there isn't really a distinction or a constitutionally significant one. So licensing regimes as footnote nine describes them are those designed to ensure that those possessing arms are authorized to do so. That is what background checks accomplish as well. If someone in California acquires a firearm, goes through a background check, how long do they get to hold that firearm before they need to show their status again with to the state of California? For carrying licenses, your honor, or for the there is a background check regime that governs the purchase of an acquisition of firearms. In many material respects, it is similar and modeled or the ammunition background check regime is modeled after that one. They just buy it and they have it at the home for home protection. Would they, at what point do, if any, do they go back to the state for a re-up? I don't think there is a re-up in that circumstance. But basically you're saying you could do that because if you can do this for ammunition, you could do that then for possession. You could make them come in every month and let's do another one. Let's see if you have a domestic restraining order now. I mean, the same analogy would apply. Right. Well, so there's a separate- You just said they were equivalent. Well, that's for the point of sale purchase of arms. There are other licensing regimes that shall issue licensing schemes that govern the carriage of firearms. But if you're correct, you can do this on ammunition purchases, then I take it you could also decide to do background checks. Every month you got to come in and do another background check or we're going to take your gun away. Well, there is an armed prohibited person database that is updated by the state to alert law enforcement to instances in which someone who possesses an arm is no longer authorized to do so. But I think that there are other- They won't do that for ammunition. They purchase ammunition. And if you could consult, you could approve them. And then if you find out that there's a problem, you could then flag them as a prohibited person and they would be caught in the standard check. Right. But there's no difference in terms of the frequency with respect to purchase. So every time you purchase a firearm, you have to establish eligibility and go through a background check, point of sale background check when you purchase a firearm in the same way that you do with ammunition. Let me see if I can use a hypothetical that will help. Shooting, let's say somebody- Let's say California have a licensing regime that says, I know you got a gun. You went and got a license to get that. You went and got a background check to get your ammunition. But we want to make sure that you haven't become a felon or a domestic abuser in between the time you did all that, because who knows, you might have a thousand rounds sitting at your house or something. So before you go and shoot at a range or anywhere, you have to get a background check. So it's just like getting ammo. And so if you did that, I think your argument would be that that somehow also would fall within footnote nine, right? Because it's a background check, just like buying a firearm is a background check. So suddenly that's part of the shell issue regime. I'm trying to figure out, it starts to feel like everything is in footnote nine. Now instead of the historical, you just have this footnote nine that can grab everything as long as you tie it to a background check. Is that, am I missing something, or is that basically where your argument leads to? I don't think so. I think the premise of the question of whether anything can be called a licensing scheme, I would disagree with it. Well, they're licensing to shoot your firearm. You got a license to own your firearm. You got a license to have ammunition, but California decides that it's helpful to have people licensed before they go shoot their firearm, because that's when the bad stuff happens, is when you shoot it. Right. So, I mean, my understanding is if any individual walks into a range or target shooting facility, there is a mechanism for ensuring that you are over age, that you are authorized to shoot. If there were an additional- California said that you have to get a background check. So the range will just run the background check for you and charge you five to twenty dollars in addition to the range fee. If they did that, would that fall in footnote nine? I don't know if, you know, the question would be, and I think this is the analytical route that footnote nine asks, the question would be- I hesitate to ask the question because I don't want to give California ideas, but like, you know, if you did that, would it fall in footnote nine? I mean, it seems like it would under your rationale. Perhaps. I mean, if it were a license, if the question is- Sounds funny because you have this label shell issue, right? And then we've pulled in ammunition under shell issue. That seems so- So, I don't know. It just seems like it's kind of expanding it further than maybe whatever the Supreme Court meant by footnote nine, which is already somewhat opaque. So, I think wherever the analysis would take the sort of check every time someone goes to shoot at a range or a target facility, it's worlds apart from where we are here. And the suggestion that the shell issue licensing regime can't be applied to ammunition and that a more stringent constitutional analysis would be required for ammunition as opposed to arms just doesn't make constitutional sense. It can't be reconciled with the plain text of the Second Amendment, nor is it consistent with how this court and the Supreme Court has treated the sort of ancillary rights doctrine. But I think the principal question that the court asks when evaluating a regime like California's is, at least with respect to Bruin's discussion of shell issue licensing regimes, is it a system that is designed to ensure that those possessing arms are authorized to do so? I think unquestionably, California's background check is a system designed to ensure that those purchasing ammunition are authorized to do so. Does it deploy objective, narrow, definite standards? It does. Is there an unreasonable delay or exorbitant fees? In this circumstance or not, the delay is tied solely to the time it takes the state to determine that an individual is authorized to purchase arms. That length, whether it's necessary to be that close, it is certainly sufficient. And here, I would submit that when you have a background check regime where 90 percent of individuals are authorized to purchase ammunition within a minute, and under a minute, that sort of delay is not the type of delay that's contemplated in the abusive scheme described in footnote nine. And then with respect to the fees, Your Honor, in this case, the fees are by statute tied to the cost, the administrative regulatory enforcement costs for the state to administer the scheme. That's in section 30370E, and that limits the amount of fees that the state may impose. Now, whatever an exorbitant fee may be and whether it's necessary for the link to be that close, at a minimum, it should be sufficient to establish that the fees in California's ammunition background regime are not unreasonable. I do think that the Supreme Court's discussion of licensing regimes is helpful in evaluating the scheme here and the conclusion that you wouldn't have to go to historical analogs to support the regime. As Judge Bybee put it in the panel decision below, there's a slightly different angle to address it. And I know, as Your Honor mentioned, the question of meaningful constraints is something that the panel from yesterday is also grappling with. I'm happy to address it if the Court has any other questions on the meaningful constraint standard. I have a question. How should Justice Scalia's language in Heller inform our understanding of footnote 9 in Bruin? There, Justice Scalia, joined by Chief Justice Roberts, Justice Kennedy, Justice Thomas, Justice Alito, said nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill or laws imposing conditions and qualifications on the commercial sale of firearms. And then footnote 26 says we identify these presumptively lawful regulatory measures only as examples our list does not purport to be exhaustive. How should that inform how we understand footnote 9 in Bruin? Your Honor, I think that that language is also sort of informed by what the Court said in Bruin itself. So in Bruin itself, the Court said that the standard for applying the Second Amendment looks first to whether the conduct is protected under the plain text of the Second Amendment, and if it is, then you have to go to history. To understand certain laws as presumptively lawful, so for example, the conditions and qualifications on commercial sales that Your Honor mentioned, I think the best reading of and the way to reconcile that language with what Bruin presents as the text and history framework for the Second Amendment is to understand that there are certain laws like conditions and qualifications on the commercial sale of arms that do not implicate the plain text of the Second Amendment. Are you saying that the acquisition of ammunition, the conduct of acquiring ammunition, does not implicate the plain text of the Second Amendment? Is that your position? Your Honor, we don't dispute the proposition that acquiring ammunition to some extent is covered by the plain text of the Second Amendment, but only to the extent necessary for an individual to exercise their Second Amendment rights. So if it's covered by the plain text, then we are supposed to then move to the analysis of a historical analog. So I think that the question in this Court has not defined the precise scope of the right to acquire ammunition that falls under the Second Amendment's plain text, and the question presented in cases like this one and other ones where the meaningful constraint standard is applied is, is the acquisition of ammunition something that falls under the plain text of the Second Amendment? If I can illustrate with a hypothetical, because I think not all acts of acquiring ammunition would, I think everyone would agree, would not necessarily fall under the plain text of the Second Amendment. So if you had, for example, law that required or prohibited purchasers of ammunition that acquired it as collectors or wanted to melt it down for the brass and the commodity, the ammunition is not for any Second Amendment purpose. I don't think that the Second Amendment's plain text would cover that act of acquiring ammunition. You're tying it to the language that the conduct at issue is self-defense, the right to keep and bear arms for self-defense. So if a person is acquiring ammunition for a firearm for self-defense, then it should be implicated by the plain text of the Second Amendment. Right. So the hypothetical is just meant to illustrate that there are certain acts of acquisition that fall under the scope of the Second Amendment and some that don't, and so the, at least with respect to the plain text. If the conduct falls within the plain text of the Second Amendment and there is no historical analog that rebuts the presumption of constitutionality, excuse me, I'm saying this wrong. If it falls within the plain text of the Second Amendment and there is no historical analog, you would agree that the regulation at issue is unconstitutional? Yes, Your Honor. I mean, I think you would reach that conclusion without doing an as-applied facial challenge. That would just be the end of the analysis. No, the historical analysis would determine whether the state had the authority to issue that regulation, and if it's inconsistent with the Second Amendment and the authority that the state has to encumber or infringe Second Amendment rights, then I don't think there would be a separate layer. I mean, of course, well, in Rahimi and Justice Gorsuch's concurrence, he said that the facial analysis, whether the regulation is facially invalid, occurred at the second step. It occurred when you're analyzing the historical record and looking for historical analogs. Do you agree with that, or do you think this analysis occurs somewhere else? Right. I mean, in Rahimi itself, there was no question that the conduct was protected by the plain text of the Second Amendment, so the court didn't have occasion to address how to determine whether something falls within or outside of the plain text of the Second Amendment. So in the context of that case, it made sense to do the facial analysis with respect to the power of the government to disarm certain prohibited persons. What the question is in this case is, is the act of ammunition without a background check something that the plain text of the Second Amendment covers? And if you, I thought Judge Beah's Yucatanki defense was incredibly helpful in going through the first principles analysis, but the ancillary rights doctrine doesn't protect that act in all respects, and so the question is, what acts are protected so that they are considered to fall under the plain text? But I think, I mean, again, if the court... So just to be clear, just to try to pin down, is your position, because I thought Judge Beah said this in his Yucatanki sentence, I can't remember if Judge Beah did in this case, but your view would be, yes, acquiring ammunition can fall and require the historical, but only if the way we are putting friction or transaction costs on acquiring the ammunition effectively eliminate your ability to acquire ammunition. So up until the point to where that we've effectively eliminated, once we've effectively eliminated, then I think I'm understanding correctly, you would agree that pushes you into ruin step two, if you want to call it, is that correct? Yeah, I don't know that the court has said that that is the only way to trigger historical analysis. I think you probably heard me ask this essay, what's short of effectively eliminated? How much drag do you have to put on acquiring ammunition before suddenly... Another way of asking that is, what counts as a meaningful constraint, right? Right. So the court has not defined what is a meaningful constraint, but I think that there are two poles that the court's case is established on the one hand, if a regulation does not impede an individual from exercising their Second Amendment rights at all. So that would be to share a B&L. Let me just ask you, practically speaking, for those 11% of people that walk in to buy ammunition and walk out with no ammunition, let's get rid of anybody that's actually prohibited, the 100 people or so that are actually prohibited out of that 50,000, do you think they've been meaningfully constrained, those 50,000 minus 100 or not? No, I mean, the meaningful constraints analysis is whether the regulation itself as a facial matter, it meaningfully constrains an individual's exercise of their Second Amendment rights. Those individuals may have it as a by challenge. What if 50% of people... What if they just... Your background check thing was flip on a coin, and 50% of people didn't get... Would that be a meaningful constraint? Well, I think the first question to ask in that context would be, especially if we're talking about a licensing scheme, is if it's a coin flip, is it actually meaningfully addressing... Can that be irrational? So maybe not a coin flip, but 11%, I guess what I'm getting at is 11% sounds like a really high error rate for most processes. But you're saying 11% is not high enough to be a meaningful constraint. I'm trying to figure out how high would it have to be to be meaningful constraint? Would it have to be 50%? I don't know, but wherever that number would be, I don't think... Somewhere north of 11%. Well, and when you have a system that has allowed literally millions of ammunition transactions to proceed... I don't understand that argument, though, because California is a very populous state. There's tons and tons of people here. So that would turn... Montana, if you were Montana, you wouldn't have literally millions because Montana doesn't have literally millions of people that live in it. So that argument seems to turn on the populous nature of California. Right. Well, and even if you don't look at direct numbers, the percentage of individuals that are able to get... Is 89%. Right. Which seems kind of... The hyper majority of individuals are able... And that's the standard check, Your Honor. There is also available for individuals that are not able to go through the standard check to proceed through the basic check. And again, the delay there, the five to six days that it takes for the state to confirm that an individual is authorized to purchase ammunition, is a delay tended to going through the four different databases and confirming an individual is authorized to do so. I have a few... I'm sorry. Something that I've been curious about. I'm not sure it's going to make a difference, but there was a proposition, a voter... A past proposition in California, I think it was notion of the background check for ammunition purchases. And that proposition required a $50 fee and it provided a permit that was good for four years and was renewable or could also be revoked for specific reasons. But then the legislature changed it to this sort of articulated scheme with multiple different ways, 18 hours that an ammunition purchase was authorized, 30 day, all the different mechanisms. Why did that happen? And how did California justify why the voter approved $50 permit that lasted for four years was not sufficient for its stated goal of keeping ammunition out of the hands of prohibited possessors? Yeah. So it was Proposition 63 that was put before the voters and some 63% of the California voters enacted it. In that ballot proposition itself was reflected the notion that the California legislature planned to pre-amend the proposition. So voters were aware that the licensing scheme would become a point of sale background check scheme. And for many of the reasons that in my earlier colloquy about the differences and whether there's a meaningful or material difference between licensing schemes and point of sale background checks, I don't think that it's constitutionally significant. Both the licensing scheme and the point of sale background check are designed to confirm that individual purchasing ammunition is authorized to do so. And the fact that technologically it's more feasible that there are immediate mechanisms for confirming eligibility at the point of sale shouldn't make that regime more constitutionally suspect. Thank you. Thank you, Your Honor. Good afternoon, Your Honors, and may it please the Court, Erin Murphy on behalf of the plaintiffs. California is one of only two states in the nation that requires individuals to obtain the government's permission every time they want to purchase the ammunition necessary to render their firearms operable. That novel, onerous, and error-ridden regime cannot be reconciled with the Second Amendment. Now I'm happy to hear from you, but I'm not going to be able to answer all of your questions. I'm happy to talk about why we think it implicates the Second Amendment wholly apart from any of these other, you know, this Court's meaningful constraints tests and all of the issues that were discussed at some length yesterday, but perhaps it would be helpful if I start by talking about Footnote 9 and why I don't think it's the right place to look here and why I don't think it does anything to immunize this particular regime from constitutional scrutiny. First, Footnote 9 was about a particular thing, a license to carry a firearm. The Court wasn't addressing background checks in the abstract and saying you can have them anytime, anywhere, in any way you want. It was dealing with the particular question in a case about permits to carry a concealed weapon. But if you claim that the ammunition is co-extensively protected with the arms for purposes of the Second Amendment, then I don't see how you don't have to equally concede that for purposes of Footnote 9, background checks for one or the other would be permissible, and then the question would be whether it's abusive and what are the criteria for abuse. So I definitely want to get to abuse it, but I would like to make the point first that the problem with this regime vis-a-vis Footnote 9 is not just that it's about ammunition. It's not a licensing regime. This isn't a licensing regime. You're not getting a license to engage in the activity of purchasing ammunition. To the 18 hours, which looks nothing like any kind of licensing regime anywhere in history or even today. Do you view Footnote 9 as not addressing a situation where you have a point of sale for a firearm purchase background check? I think it's highly relevant to that question, but it didn't directly address it. That's not what Footnote 9 was about. The Court was not dealing with point of sale requirements. It was dealing with licensing regimes, and that is different. So I think you'd have to do the work to explain how Footnote 9 gets you from a licensing regime to a point of sale requirement. So that's the first problem the state has here, but even setting that aside, this law, the reason this law is put to abuse. Can I ask you, I read the language in Heller, that's 2008. In 2010, Justice Alito joined by Chief Justice Roberts, Justice Scalia, and Justice Kennedy basically repeated those assurances that laws imposing conditions and qualifications on the commercial sale of firearms were presumptively lawful. So this Footnote 9 is actually coming along a history for 14 years of, and we can go through the list of who signed on to Footnote 9. That was authored by Justice Thomas, joined by Justice Kavanaugh, Chief Justice Roberts, Justice Alito, Justice Gorsuch, Justice Barrett. So you have so many Supreme Court justices saying, we think that laws imposing conditions and qualifications on the commercial sale of firearms are presumptively lawful for 14 years. Actually, that's not quite what Heller said and not quite what any decision census said. I'm quoting the language. It says longstanding. It starts with longstanding. Longstanding before any of the items in the list, and that's important because with that word longstanding, this isn't some inexplicable language that nobody could understand why in the world the court just picked out three things and said they're okay. With longstanding, that dicta in Heller that's carried forward actually maps on to the historical analysis that is happening in Heller, and it maps onto the Bruin test. The court is saying when it comes to certain longstanding laws. But these background checks are trying to prohibit the possession of firearms by felons and mentally ill. That is explicitly in all of these cases. Heller, McDonald, they're all saying this explicit language, and isn't that what a background check effectively does? The court has never said you can do anything and everything you want to do so long as it's in service of keeping people who shouldn't own firearms from owning firearms. Rahimi basically said the opposite. When Rahimi said, it reiterated that part of historical tradition analysis is asking whether in service of a permissible end, a permissible why, you've burdened the right to a greater degree than is consistent with historical tradition. So sure, the court has established that laws that are aimed at keeping firearms out of the hands of people who shouldn't have them are attempting to accomplish something that's permissible and consistent with historical tradition. There can't be a historical tradition of background checks because until fingerprints in computerized systems, and I recognize this isn't a fingerprint-based system in this case, but at least until you have computerized systems, you can't really do effective background check. They couldn't do them in the 1780s and look up all the records. So there can't be a historical view. There can't be the analysis that we do to evaluate a background check. I disagree because I actually think the question that you would ask is, okay, background checks, they do reflect a change in technology. So of course, you couldn't have literally had the kind of background checks you have today back in, whether you think it's 1780, 1868, whatever it is, but you ask, are the kinds of background checks that are happening today consistent with things that were done historically, consistent with the technology that existed then? And what I think that you would look to just to try and support the tradition. I mean, background checks have been around for firearms for well over a hundred years. It's just nobody until California a few years ago ever thought about extending them to ammunition. But so as soon as that technology came online, it did start to become something that was utilized and it's consistent. I think there's a very fair argument to make that it's consistent with historical licensing regimes. Licensing regimes are an effort to impose that kind of prophylactic upfront restriction to say, we're going to make sure you should be able to do something before we let you do it. And so you take from that tradition and say, now there's new technology that allows us to do that better than people were able to do it 150 years ago. The fact that that's different technology doesn't mean that you can't have any historical basis for it. That's what I take Rahimi to be talking about when the court's saying, we can look for a tradition and then apply the tradition thinking about new ways, new technology that have allowed that tradition to be implemented differently than the question here, whether this licensing scheme is similar to licensing schemes in history for arms, or do we have to look for a licensing scheme for ammunition? So I think you'd have, because it's the ammunition, you'd have to ask the question, does that make a difference? Does, you know, is there a historical basis that supports extending to what was done? Well, This follows up on Judge Collins question, but if you think that ammunition is covered by by the reference to arms in the second, in the second amendment, then it seems like it ought to be the same principle that apply either to the purchase of arms, the point of sale restrictions on purchases of arms and purchases of ammunition. And given the fact that it's conceded here that no one had ever done this until 2019, I think you have to take a little bit of time to look at the historical tradition and ask, yeah, they were arms, but did society tolerate the greater burden on the right of essentially requiring you to re-up every single time you needed ammunition? Is there a historical tradition in this country of imposing restrictions on ammunition independent from the firearm saying, even though you can have the firearm, even though you have a license to carry it, you can't carry it loaded until you get another license or you come get another background check. And there's no historical tradition that would be a restriction on carrying. And that's a whole keeping as well. You can't keep a firearm loaded in your house if you can't get ammunition. So it all comes back to the same point. If, if, if like basically it was, well, when you buy a firearm, that doesn't mean you can have any ammunition. All we meant is you can have a firearm in your house. If you want ammunition, that's a whole nother story. That's the tradition that they would need to prove to extend all of this to the realm of ammunition. And there's just no support for that whatsoever. So we do think the better answer is that, as the panel here concluded, that you just can't have these kinds of ammunition check regimes. But I do want to take a few moments to talk about why, even if you thought you could have them, this particular regime falls within the abuse of ends aspect of footnote nine. And that's because this regime on its face instructs, requires, requires the state to deprive people of their constitutional rights simply because they are not in a database that the state admits is not a comprehensive database of who can or cannot possess ammunition. So on its face, subsection B of 370, the law says, if you are not in the, in the AFS system, the state shall deny your transaction. It shall deprive you of your constitutional rights, even though everyone knows and the state will admit that the fact that you're in that database says absolutely nothing about whether you are prohibited from possessing ammunition. And that's a problem that carries over, not just... How is that not a problem that would be, that would be true of any licensing scheme as well for firearms? Oh, the state, this is what's quite different about this regime from the state's firearm regime. The state has a regime for firearm background checks that says, you have to do an actual check and you cannot deprive the person of the firearm unless they fail the background check. And even under California law, even if in 30 days... If you fail the background check, then the state has deprived you of your Second Amendment rights. If you're not in the appropriate database or you haven't filled out your information correctly... They don't do that for firearms. For firearms, they cannot deprive you of the right to purchase the firearm unless you actually fail and you are a prohibited person. They have to prove that you're a prohibited person. And if they can't prove that in 30 days, under California law, if they can't prove that in 30 days, they have to give you the firearm. Under federal law, it's under three days. So they cannot say you can't have the firearm just because we don't know if you're prohibited. They can only say you can't have it if you are prohibited. This regime on its face says, no, we can prohibit you from purchasing the ammunition even though we have no idea if you're prohibited from doing so. Can I ask a technical question about how the two systems work? In the standard system, as I understand it, it looks to see if you're on the AFS and not being on that is alone enough to get out. But then also it cross-references the prohibited armed persons file. And I take it if you're in that, you're also out. But how does the prohibited armed persons file that's consulted for the standard check differ from the four databases that are checked for the basic check? Sure. So what's happening in the prohibited persons system is essentially the state is for people that it knows knows based on records has reason to think own a firearm in California. It takes that information it gets from those four. It runs their information against those four databases routinely and will update them and put them on that armed prohibited persons list if they're prohibited by virtue of one of those four databases. But the state doesn't do that for everyone. It only does that if you're on the AFS database list, which you're only on if you haven't recorded a firearm transaction with California. So the state knows that the fact that you're not on AFS doesn't mean that you're prohibited from possessing a firearm. It just means you're not in California's database. Are there people who are on one of the four databases as prohibited person for purposes of basic who are not on the prohibited armed persons file used for the standard? Sure, there could be, yes. If you are prohibited but have never purchased a firearm in California, and had that transaction recorded in AFS, you're not going to be on the armed prohibited persons list because they're only adding people to that list if those people are already on the AFS list. So that's, you know, so it's running the same process but not creating a comprehensive armed persons file is a subset of the AFS list exclusively. There's no one on that list who's not on AFS and that's the difference between the four. And the critical thing, if you look at subsection B of 370, which is dealing with the standard check, it says two different things. It says if the purchase, you know, if they fail, if they're prohibited, we all agree, if they're prohibited, they can't purchase. But before that, it says if their information does not match an AFS entry, the transaction shall be denied. So the law says you can't exercise the right simply because you're not a match in this system. It doesn't say if you're not in the system, the state must go on to check another database. It tells you nothing about whether you're a prohibited person. It tells you nothing and the law doesn't say, you know, if they didn't, if you couldn't make a determination in the standard check, move on to the basic check. If you can't make a determination there, you have to give them the firearm. This instead carries, it says deny it. And if the citizen wants to try again, they can try again. You know, who knows if they're going to be able to get through if they haven't managed to fix the missing hyphen or whatever it is in their AFS record. They get deprived of their right all over again. And this actually... And you want us to say that because that's a possibility that could happen to some people or maybe 11% of people that the law is unconstitutional in its face? I think that's a facial problem with the law that renders the law facially abusive. The possibility that in some cases... The fact that the law specifically permits the state to deprive people of a constitutional right for a completely arbitrary reason. Any law that can be mis... I mean, any law that in some applications will deprive people of their rights is a law that can be applied. I don't think that's quite true. I mean, it's a different thing entirely when you have a law that says the reasons you can be deprived of your constitutional right include the fact that we don't have a very good database. I mean, if that's not what the court meant by abusive, I don't know what is. How is that a facial challenge? How is that a facial challenge? You're relying on facts that are outside... I'm looking through the complaint. I don't even see... And this complaint was filed before the background check went into effect, about a year before. 2018 background check went into effect July 1 of 2019. So you have no plaintiffs here who've actually been denied access to any ammunition. And I don't see in this complaint any allegation that the databases are flawed. So you're saying it's a facial challenge, but you're actually relying on things outside the text. And in Nguyen Vy Banta, we said for a facial challenge, consider only the text of the statute, but you're relying on external text material to find... I'm actually not. It's right there in the statute. Nobody disputes that the AFS system... Where does it say the databases are flawed? They're not comprehensive. That's why that line is there to say, we know that there are some people who just won't be a match in the system, just because the system doesn't have everyone in it. So somebody who knows that their information does match an AFS entry can still bring a facial challenge? Sure, because they have standing, because all of our clients have to pay a lot more money now because of this system that they believe violates their Second Amendment rights. They clearly have Article III standing. Facial challenge to the provision that says, for example, if the purchaser's or transferee's information does not match an AFS entry, the transaction shall be denied. They can bring a facial challenge, even though they know, for example, that their information does match an AFS entry. So we have two different arguments here, and we have plaintiffs who have standing to assert both of them. So we certainly have a first cut, strong form argument that you can't have this kind of regime at all. And all of our plaintiffs have standing to raise a facial challenge on the ground that the historical tradition forecloses ammunition background check regimes. We also have evidence, and we have an associational client who represents numerous members who put in declarations about how they were precluded from getting ammunition because of this problem, because they couldn't get their records fixed. It took them months on end to try. We have a declaration from one member who never got them fixed and just gave up because he couldn't figure out what the heck to do, even after consulting a lawyer. So you're telling us that your second argument is an as-applied challenge? It's not an as-applied challenge because it's based on a problem that's inherent in the regime. And this is the thing that makes this really a facial issue. Right, but I thought you were relying on members who said that they were precluded. For purposes of a standing argument, but our argument is not as-applied because the relief we're ultimately seeking is facial relief. We don't think that you can have a regime that bakes into it. What are the substantive criteria for determining abusiveness? What else? Because that may affect whether it's facial or not. I think that one of the substantive criteria for determining abusiveness ought to be if the regime by design deprives people of their rights for reasons having nothing to do with eligibility to exercise them. That seems to me to be even more important than asking whether a regime- Did California design its regime with that purpose in mind, or is that a byproduct? Is that a possibility that it will result? It is a result of the rejection of Proposition 63. This would not have happened under Proposition 63. Okay, but Proposition 63 is not before us. We've got this law, and now I'm trying to figure out whether you've got anybody who has actually been- whether on its face the system is designed to reject people for reasons that are not relevant. It plainly is. The words of it say that. The words of it say, deny somebody their rights solely because they're not in the database. That reason has nothing to do with eligibility to exercise Second Amendment rights. On the face of it, it says you can deny- you shall deny, shall deny the transaction just because you're not in the database. Counsel, is there any way they could have a database that would not create a constitutional- So I think that- I mean, obviously, we have a stronger form argument that we think these types of regimes are completely unconstitutional, but I think this would be a much harder case for purposes of this, like, abusive ends analysis if the state had stuck with something like Proposition 63. Because what Proposition 63 said is that the state had to create a database of all the people who were eligible to purchase ammunition, and then you could get that four-year card that says, I'm in that database. And if you did that, if the state created a comprehensive database, at least you wouldn't have this problem. But what- Suppose they just- they had the standard check, but they got rid of the AFS feature, and they just had the feature that the sale of the ammunition is disallowed if you're on the prohibited persons list. Would that be unconstitutional? I mean, the problem is it doesn't work, because the state will come up here and tell you that wouldn't capture all the people who are prohibited. Oh, I understand. But I don't- I think that- The other inclusive- Under our abusive ends argument, that regime would probably be fine. Now, we might still have an argument about- We obviously do have an argument about whether we think the state can make people re-up over and over and over again every time they get ammunition. But I don't think you'd have the same abusive problem if you just said, look, we've got a database of prohibited persons. We're going to run and check whether you're on it. If you are, you can't possess ammunition. But if you're not, we're not going to say, we don't really know if you can possess it, so we're just going to deny you anyway. That's the problem. And again, I mean, even California's own licensing regimes, there's no other licensing regimes that say that you can deny the right even if you haven't made a determination that the person's a prohibited person. They say the opposite. They all say you have X amount of time to make the determination. And if you can't make the determination by then, you have to let the person exercise the right. You can continue to investigate them if you find out they're prohibited, you could come confiscate their arms. But at a certain point, if the tie doesn't go to the state's background check regime, it goes to the citizen. Yet this regime imposes no limit ever on the state's ability to keep running this check. And in fact, the regulations say that if at the end of the basic check, the state can't figure out whether you're eligible, it must deny. It denies. So the tie here goes to the state. That is all incompatible with the way licensing regimes have operated and background check regimes have operated in this country for a century. So this really is a truly outlier regime, not just in the fact that it's coming at ammunition, but in the way it was structured and the way that the state decided that it was going to essentially create a regime without creating the comprehensive database necessary to run the background check. Councilor, can I ask a question about meaningful constraint in our BNL decision? First of all, do you believe that our BNL decision is consistent with the Second Amendment and Supreme Court precedent? And secondly, do we have to reach that in order to rule in your favor? So setting aside the bottom line holding a BNL, I think the reasoning of BNL in terms of the meaningful constraints test is incorrect. I think the right way to analyze under is to follow what the Supreme Court said in Rahimi. The court said in no uncertain terms that if a law regulates arms bearing conduct, the state bears the burden of proving that it's constitutional. It didn't say it prohibits, nearly prohibits, imposes a law, a substantial burden, a meaningful burden, none of that. The court said more than once if it regulates arms bearing conduct, you go to historical tradition. I think that is the right test. I don't think it's any different as to conditions and qualifications. There too, all the questions about whether it's a permissible burden, whether it's a permissible how, why should happen under historical tradition. Now, I don't think for purposes of this case, I think you can resolve this case in our favor on a couple of paths without overruling that. For one, this court has never said in, I don't think, I don't read any of this court's opinions to say that across the board restriction on the ability to access arms isn't a meaningful constraint. Obviously, Yukatake, you're reconsidering, but the panel in Yukatake drew exactly that line and the panel in Winn drew exactly that line. And that's consistent with the line that Rahimi drew because Rahimi said there's a difference between laws that impose restrictions on particular people and laws that impose front-end restrictions on everybody's ability to exercise the right. Just following up on the BNL, on the BNL question just a little bit. There are a series of circuits, 2nd, 4th, 5th, 6th, 10th, that have addressed either BNL or something like BNL. And it looks to me that most of those circuits, although they varied slightly in their language and their approach, are pretty sympathetic to BNL. Do you have any other circuit that's gone the other way? Well, so I'd take issue with a couple of the ones on your list because while McCrory sounded more like BNL, the 5th Circuit said pretty different things. Well, I think there's ways of distinguishing McCrory and... And I think the 10th Circuit,  Rocky Mountain sounded a little more like BNL and Ortega sure didn't sound like BNL since it applied historical tradition to... But I think the... I read the 6th Circuit as embracing our position, the Nip case. That's the Judge Larson opinion that dealt with acquisition by a felon. And what she said is, just because this is all in like... None of this gets a presumption of constitutionality. You have to do it exactly under traditional analysis under Bruin. And she just said that particular law ended up satisfying historical tradition. So I think that's where the 6th Circuit is. I think it's... I think it's closer to where the 10th and 5th Circuits are. Certainly, it's the position that was adopted by several judges, but not the majority in the 4th Circuit in the Maryland Shell issue case. So there's certainly plenty of support and plenty of jurists throughout the country who have read Haller, Bruin, Rahimi, all of them, the way that we think are the better way to read that language. The 2nd Circuit has followed our Meaningful Constraint Test in a number of cases. And one of them, CERT, was actually denied by the Supreme Court. So if the Supreme Court had so much objection to this Meaningful Constraint Test, they could have easily granted CERT and reversed in that case, right? Because there are a number. I think the Supreme Court denied CERT in about at least a dozen petitions, many of them filed by me, asking the court to consider the two-step pre-Bruin test. But ultimately, it nevertheless took up that issue and said every single circuit had it wrong. So I would be very reluctant here to read too much into the Supreme Court's decisions about which cases to grant or deny, particularly on questions that are, you know, in many respects, still percolating among many of the courts. So the answer to my question is you think that Judge Larson has got probably the most analogous opinion? I think of the judges in the majority. And then what about in Maryland? Do you have a favorite? I mean, I think Judge Richardson got the historical analysis correct more than I necessarily. I'm sure I agree with everything. Judge Rushing said, but I think they're both right. They reached the same conclusion, as did Judge Niemeyer, on the question of whether there should be a presumption of constitutionality. All of them rejected the majority's approach of saying that laws that are covered by footnote 9 or the Heller dicta don't go through the traditional Bruin analysis. I agree with all of them on their approach to that question of what the threshold inquiry under Bruin entails. Thank you. Good afternoon, Your Honors. May I please support Gregory Dolan for the United States. We're here to emphasize two points. First, when a law regulates on its face the right to keep and bear arms, it must be analyzed in Bruin stuff, too. So I'm just going to pick up where Ms. Murphy left off. Why do you say that? If you look at the plain text, at the time of the Revolutionary War, if someone wanted to fire an arm, you had to have flint, you had to have powder, you had to have some kind of stuffing and some time. How far did it go?  You go to a manufacturing facility? I'm just not sure you can say that automatically the plain text gets you where you want. You seem to be saying automatically we're at the second step. How do you get there? Two-part answer. First, the Supreme Court was very clear in Heller and McDonald that what's covered under Second Amendment are not merely the type of arms and the type of ammunition and the type of technology that was available at Revolutionary War. It's what's in common use today. And so the fact that it was took more time to load your gun and... So it's what today, not historically, and yet you want us to go back to the historical analysis. I think you're mixing and matching Bruin step one and step two. So at step one, the question is whether the Second Amendment covers the conduct that the petitioner or the plaintiff wishes to engage in. And that conduct includes keeping and bearing firearms that can be accessible for immediate use for purposes of self-defense or other lawful purposes. Now, once the statute in question does read on that conduct, that at Bruin step two, you look at whether or not the restriction meets with historical analogs. Yeah, I guess what I'm struggling with is you, if I'm understanding you correctly, you're just basically saying skip to step one. You automatically get to step two. I'm not sure how you get there so quickly. No, not at all, Your Honor. I think that to be within Bruin step one, the statute in question must directly regulate the conduct that is protected by the Second Amendment, which is a right to keep and bear firearms which Supreme Court has interpreted in Heller and McDonald to include operable firearms and operable for immediate purposes of self-defense or other lawful uses. So if the statute regulates that conduct, and of course, without bullets, a gun is not operable for self-defense or any other use. It's just a piece of metal that I suppose you can bump somebody over the head with it, but it cannot be used as a firearm. Like the Hessians did, right? Right, I suppose, right. But like you cannot do it as a, you cannot use as a firearm. So the only way it's an operable firearm is with bullets. And that was actually in some sense an issue in Heller itself as well. There, one of the restrictions that DC imposed was that you could keep, at least some people could keep a firearm at home, but it had to be disassembled and a trigger locked and all of those things. The Supreme Court said, no, no, no. It has to be accessible for immediate use for self-defense or other lawful purposes. Mr. Dillon, there are a great many restrictions on firearms and ammunition that might sort of have an ancillary effect on the Second Amendment, on the core Second Amendment right throughout Title 18 and other provisions of the United States Code. And your brief mentions basically none of them. So do you care how much of that we might invalidate if we adopt your position and plaintiff's position? I don't think if this court were to adopt the United States position, you would call any of the federal laws into question. Because again, any challenge with the federal law would have to satisfy, would have any chance of the federal law would have to go through Bruins Step 1 and then Step 2. And some of those challenges would fail under Bruins Step 1 because the conduct regulated is not exactly, it was not directly regulating Second Amendment. So imagine a general sales tax. Yes, it makes some firearms more expensive, but it doesn't actually regulate directly the ability to keep and bear arms. And some of those challenges will fail under Step 2 because, for example, federal restriction on felons owning firearms or people with mental illness have longstanding historical analogs. And so sort of relatedly, your brief does not discuss the fact that this is a facial challenge, but you're supporting plaintiffs. So do you want us to adopt their view of how facial challenges work and then apply that view when next we have a facial challenge to an act of Congress or an executive order? We have taken no direct position on that, Your Honor, but I think Ms. Murphy is correct that this statute on its face says that if you're in this incomplete database, that the state doesn't need to prove that you're a prohibited person, right? The state merely says like, look, you haven't, you're not in our database and that might affect, for example, someone who can come in for, let's say, you know, a birthday celebration where somebody goes to a range in California to shoot, but the person who comes in comes in from Nevada, they're not in California database. And if they want to purchase ammunition... What's the government's view as to what are the substantive criteria we use in determining whether something is abusive for purposes of footnote nine and where do we get those from? So there are several ways of looking at it. So, for example, when it comes to fees, so fees, as Third Circuit recently spoke on this, so fees that are significantly in excess of what it costs the government to operate the system might be abusive. Extraordinary delays might be abusive. But our position is not... We disagree with a state that merely because it's a shell issue regime or merely because they're talking about commercial transactions... But you're just saying, we just ask ourselves whether we think it's abusive. We just apply our own... Where do we get these criteria from? Abusive, obviously, it's in some sense is a judgment call, but there are some sort of guidelines to excessive fees. And again, what's excessive? Of course, by definition, what's excessive is always a question in relation to what, right? So, for example, in relation to what it costs around the system. But the point I was trying to make is that you don't need to get to the abusive regime here because the big problem with this system is not so much that it is abusive, although it is that. The big problem with this system is that it has absolutely no historical analog. Up until 2019, no state in the history of the country has imposed any sort of checks on the purchase of ammunition. And so once you get to Bruin step two, there's kind of these two subsidiary questions. Is the government's position that, you know, you probably listened to yesterday's argument. I did. So the question is whether you... Is footnote nine somehow just an exempt from the historical analog analysis? Or it sounds like your position is you do historical... You do historical analysis. And the reason footnote nine works is obviously the court doesn't get into long exegesis on exactly that. But they do know that in the footnote nine itself, it says that we do not cast doubt on 43 states doing this. So that 43 states actually is a hint to you that this is a longstanding widespread practice that would meet Bruin step two. So it's not a carte blanche to say, oh, once you label something a shell issue regime, anything goes. And you can check for farms. You can check for ammunition. You can check every time before you shoot. No, it's that it still has to go through the traditional... You don't see footnote nine as some sort of safe harbor where the historical analysis does not apply. No, we do not. We think footnote nine is simply telling the lower courts and litigants and firearm owners and legislatures that this regime or these 43 regimes adopted by almost across the board plus the federal government have a long history. And most likely because of that long history, once you run it through the algorithm of Bruin, it would meet both step... The regulation would pass either under Bruin step one or step two. Do you want to comment on Justice Kavanaugh's concurrence, which was joined by the chief, said background checks, mental health record checks, those are all constitutionally permissible. If they're going to be subject to a challenge as applied as the appropriate challenge to do. And it just seems like you're kind of wanting some hybrid system that is really more of an over-breath challenge. Which in Salerno, the court said that only exists in the context of the First Amendment. You're trying to say, well, there's some conceivable circumstances. There might be some people who will be unjustifiably denied, even though the vast majority of people, they will get an accurate and non-erroneous record check. So why is that not inconsistent with a facial challenge? So I think I would go back to the question judgment I asked previously. Right here, it's an 11% error rate. And so it's not going to just a one-off. But that's not a facial challenge, right? That's an as-applied challenge. If we're looking at the facts of what is going out in the real world, that's an as-applied challenge. And as far as I see, none of your plaintiffs have been denied your complaint that's operative was filed even before the background checks went into effect. They went into effect a year before. So I'm not saying you may not have a successful as-applied challenge, but it just seems like it's premature right now. So I think I would refer back to what Ms. Murphy was saying when she was up here, and that is that on its face, the statute denies permits to people or ability to purchase ammunition to people who are not- But that doesn't at all say that they're erroneously denied, right? You would concede that the vast majority of people who are going to be denied are actually appropriately being denied. No, I- Because they don't qualify because of either domestic violence restraining order, mental illness, felony conviction, whatever. Well, I would certainly not concede that simply on the base of this record where the people who are being denied correctly, so the true positives are minuscule compared to false positives. But on its face, the statute- But that's an as-applied challenge, right? If we're even looking at the facts of exactly who's being denied, for what reason, what's happening, that's not a facial challenge. I understand that, but, Your Honor, you asked me whether or not I would concede that most people who did not get denied correctly, and I think that's just not true as a matter of fact here. But as a matter of law, when the statute says people who are on this database that is known, again, on the face of the statute or regulations, that is not a comprehensive database, they shall be denied. That is a facial challenge. Now, and- Thank you, Mr. Dolan. Thank you very much. Ms. Hong, you didn't have any time, so I'm gonna give you three minutes, but I'm also gonna ask you a question if you could please respond to Ms. Murphy's argument that in response to Judge Koh's question regarding the point-of-sale requirements and licensing regimes, and Ms. Murphy highlighted that the word longstanding was the significant difference there, and also if you could respond to this argument regarding the incomplete database. Sure, Your Honor. So with respect to the qualifier longstanding, as I understand it, the question is whether the class of regulations is longstanding. And I think that Ms. Murphy's acknowledgement during the argument that background checks have been around for a few hundred years for firearms really functionally answers the question that's presented in this case about whether the ammunition background check regime is similar enough to shell issue licensing regimes or the types of conditions and qualifications on commercial sales that it would be presumptively lawful. That confession really does answer the questions that is presented in this case. But counsel, I'm sorry, I know there's two questions coming, but following up on this first question and your answer here, why shouldn't we treat ammunition differently or if we're looking at the historical analog, isn't it, I mean, wouldn't we look at it and say, well, ammunition isn't, background checks may be required to buy the gun, but not to buy the ammunition. I don't understand why that wouldn't be analogous. Sure, if we're faithful to Bruin's standard that requires us to take a tech-centered approach, it would be quite odd to give arms less protection than ammunition in this context. But I think if you were just stepping back about the ammunition versus arms distinction here, what I understand my friend to suggest is that because there were no background checks for ammunition, you can't have one that exists today. That really is the type of rigid analysis that Rahimi rejects. Rahimi, I think Justice Barrett put it really well, which is you don't need an updated model of a historical regulation. What you need is a principle that supports the state's law. And for the reasons we've discussed, I think the principles that inform background checks and what my friend has acknowledged has been around for a few hundred years or for a hundred years is a principle that supports the ammunition background checks here. And it's not really surprising that the type of ammunition background check regime that we have today didn't exist at the founding beyond the fact that commerce and arms didn't really take off until the late 19th century. Can I ask Clare? I didn't want to derail. I think the chief had a second part of her question that I- Then you can answer Judge Collins' question. But- Sure. And I think the question related to the databases and the, right. So I guess I find it odd that it would be unreasonable for the state to rely on a database that records all handgun and long gun transactions dating back to 1998 and 2014. So anyone who has purchased an arm in the state of California ends up in the AFS system, the automated firearm system, if you purchased a handgun after 1998 or purchased a long gun after 2014. And to rely on that system to determine whether an individual is- And that's one of the ways, right? But to determine whether an individual has a second amendment plain text protected right to acquire ammunition. I just don't think that the mismatch exists there. And to the extent that certain individuals have found it difficult to update their AFS records, to get their entries in, or they acquired a firearm in a different way, there are various mechanisms that the Department of Justice has publicized for individuals to either correct and update their records or to submit a firearms ownership report in order to get onto the AFS system so that a purchaser can take advantage of the immediate authorization that the standard background check allows at the point of sale. And of course, what's really important too is that for any individual who can't update their records or decides they don't want to be in AFS, they have the basic background check system available to them where they can undergo the sort of more rigorous background search of the four different databases to determine whether they're prohibited or not. I just had a technical question about the interstate provision, which we haven't talked about, which says a resident of this state shall not bring or transport into the state any ammunition that he or she has purchased or otherwise obtained from outside this state unless he or she has that ammunition delivered,  But then one of the exceptions is a person who, that doesn't apply to a person who acquired the ammunition from a spouse, registered domestic partner, or immediate family member. So if a couple goes to Nevada and the wife buys a thousand rounds of ammunition from a dealer there, she buys them herself. She then goes in the parking lot, gives them to the husband and the husband brings them back to California. Is that exempted? It seems under the plain language, it would be. I want to understand the scope of the prohibition. Right. I don't know if that would be lawful under the other jurisdictions straw purchasing laws. So I don't want to speak to that. But yes, 30314 only speaks to transfer sales or delivery. That might be considered a straw purchase if they had prearranged it. If she buys it and then decides, you know, I'm going to give this to him, then that would be okay. I don't know, your honor. I mean, what I will say is that exception also exists in 30312. So apart from sort of importing or transporting ammunition from out of state into the state, it is also lawful within the state for a spouse, a registered domestic partner, or an immediate family member to provide ammunition to a family member. Any concluding statement? Your honor, I think, no. We would just ask that the court reverse and a direct entry of judgment on behalf of the attorney general. Thank you. Thank you, Ms. Hong, Mr. Murphy, Mr. Dolan. Thank you very much for your oral argument presentations here today. The case of Kim Brody versus Rob Bonta and his official capacity as attorney general of the state of California is now submitted. And we are adjourned. Thank you. Court for the second sentence adjourned.
judges: MURGUIA, BYBEE, SMITH, BENNETT, NELSON, MILLER, BADE, COLLINS, VANDYKE, KOH, SUNG